**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

|                                              |     |                            |
| -------------------------------------------- | --- | -------------------------- |
|                                              | )   |                            |
| AFRICA GROWTH CORPORATION                    | )   |                            |
|     3773 Howard Hughes Parkway               | )   |                            |
|     Suite 500S                               | )   |                            |
|     Las Vegas, Nevada 89169,                 | )   |                            |
|                                              | )   |                            |
|             Plaintiff,                       | )   | Civil Action No.: 17-2469  |
|                                              | )   |                            |
| v.                                           | )   |                            |
|                                              | )   |                            |
| REPUBLIC OF ANGOLA                           | )   |                            |
|     Procuradoria Geral da República          | )   |                            |
|     Rua 17 de Setembro                       | )   |                            |
|     Palácio do Povo, 1º Esqº                 | )   |                            |
|     Luanda ANGOLA,                           | )   |                            |
|                                              | )   |                            |
| GENERAL FRANCISCO HIGINO LOPES               | )   |                            |
| CARNEIRO                                     | )   |                            |
|     c/o Republic of Angola                   | )   |                            |
|     Procuradoria Geral da República          | )   |                            |
|     Rua 17 de Setembro                       | )   |                            |
|     Palácio do Povo, 1º Esqº                 | )   |                            |
|     Luanda ANGOLA,                           | )   |                            |
|                                              | )   |                            |
| GENERAL JOAO MARIA DE SOUSA                  | )   |                            |
|     c/o Republic of Angola                   | )   |                            |
|     Procuradoria Geral da República          | )   |                            |
|     Rua 17 de Setembro                       | )   |                            |
|     Palácio do Povo, 1º Esqº                 | )   |                            |
|     Luanda ANGOLA,                           | )   |                            |
|                                              | )   |                            |
| GENERAL ANTONIO FRANCISCO                    | )   |                            |
| ANDRADE                                      | )   |                            |
|     c/o Republic of Angola                   | )   |                            |
|     Procuradoria Geral da República          | )   |                            |
|     Rua 17 de Setembro                       | )   |                            |
|     Palácio do Povo, 1º Esqº                 | )   |                            |
|     Luanda ANGOLA,                           | )   |                            |
|                                              | )   |                            |

CAPTAIN MIGUEL KENEHELE ANDRADE )
 c/o Republic of Angola )
 Procuradoria Geral da República )
 Rua 17 de Setembro )
 Palácio do Povo, 1º Esqº )
 Luanda ANGOLA, )
  )
ANGOLAN STATE PROSECUTOR )
NATASHA ANDRADE SANTOS )
 c/o Republic of Angola )
 Procuradoria Geral da República )
 Rua 17 de Setembro )
 Palácio do Povo, 1º Esqº )
 Luanda ANGOLA, )
  )
   Defendants. )
_____ )

## COMPLAINT

Plaintiff Africa Growth Corporation ("AFGC"), a publicly-listed and OTC-traded Nevada corporation, sues defendants the Republic of Angola ("Angola"), a foreign state; Angolan General Francisco Higino Lopes Carneiro, acting in his official capacity as Governor of the Province of Luanda, Angola ("General Carneiro"), a political subdivision or an agency or instrumentality of a foreign state; Angolan General Joao Maria de Sousa, in his official capacity as Attorney General of the Republic of Angola ("General de Sousa"), a political subdivision or an agency or instrumentality of a foreign state; Angolan General Antonio Francisco Andrade ("General Antonio Andrade"), a political subdivision or an agency or instrumentality of a foreign state; Angolan Army Captain Miguel Kenehele Andrade ("Captain Miguel Andrade"), a political subdivision or an agency or instrumentality of a foreign state; Angolan State Prosecutor Natasha Andrade Santos ("Prosecutor Natasha Andrade"), a political subdivision or an agency or instrumentality of a foreign state (all agencies and instrumentalities collectively referred to as the "Angolan Instrumentalities") (the three Andrade defendants collectively referred to as the

"Andrades" or the "Angolan Government Illegal Agents") (all defendants collectively referred to as the "Defendants"), and alleges as follows:

## NATURE OF THE ACTION

1.      This action against Angola and the Angolan Instrumentalities involves commercial activities and acts effecting a taking of property that are not protected under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq.* ("FSIA"). The purpose of this action is to recover substantial amounts in damages in excess of US$55 million owed to AFGC arising from Defendants' unlawful conspiracy, expropriation, and outright theft of AFGC's properties and rental income in Angola.

2.      In the good faith, but now shown to be mistaken, belief that Angola observes and enforces its own rules of law and protects the rights of foreign investors, AFGC legally acquired certain real estate and commercial properties, including registered title thereto, in Luanda (the Angolan capital) in January 2015.   AFGC managed high-end apartment complexes on these properties and subsequently leased apartment units to Angolan residents and the employees of foreign companies operating in Angola.

3.      Defendants conspired to use fraudulent documents, the appearance of legitimacy of the Angolan government, intimidation, and force of arms to gain control over AFGC's subsidiaries in Angola in order to seize, expropriate and unlawfully transfer title to AFGC's assets in the name of Angolan State Prosecutor Natasha Andrade. These actions were taken in clear violation of Angolan and international law and aided and abetted by official governmental representatives of the Republic of Angola.

4.     All efforts by AFGC since the unlawful seizure and expropriation of its property by Defendants to obtain legal remedy and compensation in Angola have been blocked, ignored or commercially hindered.

5.     Accordingly, AFGC seeks this Court's intervention to be made whole and recover from Defendants: a) the fair market value of the properties fraudulently and illegally taken from AFGC and rents derived from the commercial properties also converted as a result of the illegal taking; b) the future profits that otherwise would have continued absent the unlawful seizure of AFGC's assets; c) the treble damages to which AFGC may be entitled under the civil RICO statutes, including attorneys' fees; and d) all such other and further relief as the Court may deem appropriate.

## THE PARTIES

6.     Plaintiff, AFGC, is a Nevada corporation with its registered office address in Las Vegas, Nevada. AFGC is a U.S. publicly traded, OTC-listed company, and the majority of its stock is owned by U.S. shareholders.

7.     Defendant Angola is a "foreign state" within the meaning of 28 U.S.C. § 1603(a).

8.     Defendant General Carneiro is a political subdivision of the foreign state of Angola or is an agency or instrumentality of the foreign state of Angola pursuant to 28 U.S.C. § 1603(b) because he is (1) a separate legal person, (2) an organ or political subdivision of the foreign state, and (3) not a citizen of any state of the United States as set forth under 28 U.S.C. § 1332(c) and (e). Accordingly, General Carneiro is a "foreign state" pursuant to 28 U.S.C. § 1603(a), which includes an "agency or instrumentality of a foreign state" as defined under 28 U.S.C. § 1603(b). As a General in Angola, General Carneiro is immune from prosecution in Angolan courts.

9.      Defendant General de Sousa is a political subdivision of the foreign state of Angola or is an agency or instrumentality of the foreign state of Angola pursuant to 28 U.S.C. § 1603(b) because he is (1) a separate legal person, (2) an organ or political subdivision of the foreign state, and (3) not a citizen of any state of the United States as set forth under 28 U.S.C. § 1332(c) and (e). Accordingly, General de Sousa is a "foreign state" pursuant to 28 U.S.C. § 1603(a), which includes an "agency or instrumentality of a foreign state" as defined under 28 U.S.C. § 1603(b).  As a General in Angola, General de Sousa is immune from prosecution in Angolan courts.

10.      Defendant General Antonio Andrade is a political subdivision of the foreign state of Angola or is an agency or instrumentality of the foreign state of Angola pursuant to 28 U.S.C. § 1603(b) because he is (1) a separate legal person, (2) an organ or political subdivision of the foreign state, and (3) not a citizen of any state of the United States as set forth under 28 U.S.C. § 1332(c) and (e). Accordingly, General Antonio Andrade is a "foreign state" pursuant to 28 U.S.C. § 1603(a), which includes an "agency or instrumentality of a foreign state" as defined under 28 U.S.C. § 1603(b). As a General in Angola, while currently inactive, General Antonio Andrade remains in his official capacity and is immune from prosecution in Angolan courts.

11.      Defendant Captain Miguel Andrade is a political subdivision of the foreign state of Angola or is an agency or instrumentality of the foreign state of Angola pursuant to 28 U.S.C. § 1603(b) because he is (1) a separate legal person, (2) an organ or political subdivision of the foreign state, and (3) not a citizen of any state of the United States as set forth under 28 U.S.C. § 1332(c) and (e). Accordingly, Captain Miguel Andrade is a "foreign state" pursuant to 28 U.S.C. § 1603(a), which includes an "agency or instrumentality of a foreign state" as defined under 28 U.S.C. § 1603(b).

12.     Defendant Angolan State Prosecutor Natasha Andrade is a political subdivision of the foreign state of Angola or is an agency or instrumentality of the foreign state of Angola pursuant to 28 U.S.C. § 1603(b) because she is (1) a separate legal person, (2) an organ or political subdivision of the foreign state, and (3) not a citizen of any state of the United States as set forth under 28 U.S.C. § 1332(c) and (e). Accordingly, Prosecutor Natasha Andrade is a "foreign state" pursuant to 28 U.S.C. § 1603(a), which includes an "agency or instrumentality of a foreign state" as defined under 28 U.S.C. § 1603(b).

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this cause pursuant to 28 U.S.C. § 1330(a), which provides that "[t]he district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state" within the meaning of 28 U.S.C. § 1603(a).

14.     Accordingly, this Court has jurisdiction over Angola pursuant to 28 U.S.C. § 1330 and 28 U.S.C. § 1603(a).

15.     This Court has jurisdiction over General Carneiro pursuant to 28 U.S.C. § 1330(a) and 28 U.S.C. § 1603(b).

16.     This Court has jurisdiction over General de Sousa pursuant to 28 U.S.C. § 1330(a) and 28 U.S.C. § 1603(b).

17.     This Court has jurisdiction over General Antonio Andrade pursuant to 28 U.S.C. § 1330(a) and 28 U.S.C. § 1603(b).

18.     This Court has jurisdiction over Captain Miguel Andrade pursuant to 28 U.S.C. § 1330(a) and 28 U.S.C. § 1603(b).

19.     This Court has jurisdiction over Prosecutor Natasha Andrade pursuant to 28 U.S.C. § 1330(a) and 28 U.S.C. § 1603(b).

20.     Defendants are not immune from the jurisdiction of this Court in this case under the FSIA, 28 U.S.C. § 1604, for the following reasons:

    a.  Pursuant to 28 U.S.C. § 1605(a)(2), all Defendants have taken acts outside the territory of the United States in connection with a commercial activity, and said acts have caused a direct effect in the United States; and

    b.  Pursuant to 28 U.S.C. § 1605(a)(3), all Defendants have taken rights in property in violation of international law and that property is owned and operated by instrumentalities of the foreign state which are engaged in a commercial activity in the United States.

21.     Defendants are not immune from the jurisdiction of this Court because they undertook acts in connection with a commercial activity that caused a direct effect in the United States, as follows:

    a.  In furtherance of their unlawful conspiracy, Defendants have taken multiple acts that culminated in the forced taking of commercial property belonging to AFGC located in Angola (further below defined as the "AFGC Assets") without the knowledge or consent of AFGC, thus divesting AFGC of private property and rental income for the benefit of the Angolan Government Illegal Agents and their commercial endeavors, which has resulted in monetary losses in excess of US$55 million to AFGC, a US corporation with US shareholders, with such losses having a

direct and material adverse effect on AFGC and its shareholders in the United States; and

    b. In furtherance of Defendants' unlawful conspiracy, Captain Miguel Andrade transmitted correspondence to the Chairman of the US Securities and Exchange Commission ("SEC"), as further explained below, in which he made material false statements and accusations regarding AFGC's commercial activities in Angola, which are claimed to be adverse from those commercial activities of the Angolan Government Illegal Agents, with such letter and accusations having a direct and material effect on AFGC, a US corporation with US shareholders, in the United States.

22.    Defendants are further not immune from the jurisdiction of this Court because they have taken rights to property in violation of international law, as follows and as more fully described herein:

    a. Defendants caused a forced taking of AFGC's property in Angola, without compensation, not for a public purpose, in a discriminatory manner, and without due process of law;

    b. In taking AFGC's property, Defendants unreasonably discriminated against AFGC based upon the nationality of AFGC's shareholders in violation of international law; and

    c. Defendants are engaged in commercial activities in the United States.

23.    General Antonio Andrade is the father of Captain Miguel Andrade and of Prosecutor Natasha Andrade. The Andrades have acted under color of state law and with the

authority of state law in undertaking the acts herein mentioned, and they have operated with the knowledge and approval of the Angolan Government and its political subdivisions.

24.     As a publicly-traded Nevada corporation, with the majority of its shareholders U.S. citizens, AFGC suffered domestic injury as a result of Defendants' RICO actions, as more fully described below. Such domestic injury satisfies the requirements set forth under *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090 (2016).

25.     AFGC has suffered damages as a direct result of the acts and omissions by Defendants asserted in this Complaint in excess of US$55 million.

26.     Venue is proper in the United States District Court for the District of Columbia pursuant to 28 U.S.C. § 1391(f)(4), because this action is brought against Defendants, each of which are a foreign state, political subdivision of a foreign state, or agency or instrumentality of a foreign state, within the meaning of 28 U.S.C. § 1603(a).

## GENERAL ALLEGATIONS

**I.     AFGC, through its wholly-owned Angolan-based subsidiaries, acquires the AFGC Assets**

27.     In January 2015, AFGC, through its wholly owned, Angolan-based subsidiaries, acquired two residential real estate properties, consisting of three buildings (named "Isha 1", "Isha 2" and "Pina") that were divided into 64 apartments and 7 offices, in Luanda, Angola.

28.     AFGC sought to further invest in Angola and expand its business operations to construct and finance middle- and low-income housing and to develop or acquire high-end residential apartments for rent in Luanda.

29.     Following the acquisition of Isha 1, Isha 2 and Pina, AFGC began the construction of a fourth building (named "Isha 2.5"), which contained another 40 apartments. Isha 1, Isha 2, Isha 2.5 and Pina are collectively referred to hereinafter as the "AFGC Assets."

30.     The AFGC Assets were acquired with the advice and assistance of Angolan legal counsel and in full compliance with Angolan law.  Full legal title to the AFGC Assets passed to AFGC, through its wholly-owned subsidiaries, and was duly registered with the Conservatoria do Registo Predial (the official Angolan Real Estate Registry).

31.     From January 2015 onward, Illico Lda. ("Illico"), one of AFGC's wholly-owned subsidiaries in Angola, succeeded in developing the AFGC Assets and renting apartment units and offices to Angolan residents and the employees of foreign companies and foreign diplomats residing and working in Luanda, Angola.  All rental incomes were deposited into Illico's local bank accounts.

## II.     The Angolan Government Illegal Agents bear no legal relationship to AFGC, any of its subsidiaries, or the AFGC Assets

32.     General Antonio Andrade has never had any lawfully obtained title, ownership interest or corporate position in AFGC, its subsidiaries or affiliates, or the AFGC Assets.

33.     Captain Miguel Andrade previously held a position as director and held a minority ownership interest in an entity that sold, transferred for value, and relinquished all of its interests in the AFGC Assets to AFGC. Since AFGC acquired the AFGC Assets, Captain Miguel Andrade has never held any lawfully obtained title, ownership interest or corporate position in AFGC, its subsidiaries or affiliates, or the AFGC Assets.

34.     Prosecutor Natasha Andrade has never held any lawfully obtained title, ownership interest or corporate position in AFGC, its subsidiaries or affiliates, or the AFGC Assets.

## III.     The Angolan Government Illegal Agents engage in conspiracy and fraud to convert the AFGC Assets

35.     Beginning in October 2016, General Andrade used his official title and powers within the Angolan government to fraudulently prepare Powers of Attorney, which purported to

appoint one of his associates as the shareholder representative of two of Illico's parent companies, AGPV Lda ("AGPV") and Maximilio Lda ("Maximilio"), but in truth and in fact, were forged at the direction of General Antonio Andrade.  These documents falsely purported to be signed by Sergio Pereira de Lima Estevao, the actual shareholder representative of AGPV and Maximilio who has acknowledged that his signature was forged.

36.     The purpose of these fraudulent acts was to dismiss the current and lawful director and *Gerente* (General Manager) of Illico, Ildfonso Massango, and unlawfully appoint General Antonio Andrade as the director and *Gerente* of Illico, with signature authority over the Illico bank accounts.

37.     AFGC, through Illico, only became aware of these specific instances of corporate fraud later, as they were not properly recorded and documented in the official corporate registry of Angola, which is administered by the Angolan Guichet Unico de Empresa ("GUE"), a division of the Angolan Ministry of Justice.

38.     Indeed, the unlawful appointment of General Antonio Andrade as the director and *Gerente* of Illico appears to have been concealed by the Angolan Instrumentalities in order to facilitate and enable the fraud and theft of the AFGC Assets.

39.     AFGC learned of these fraudulent appointments, changes, and activities when Illico's legally and validly appointed authorized representatives were blocked from making bank transfers to and from the Illico accounts and subsequently learned that General Antonio Andrade was attempting to make bank transfers to his personal account from Illico's account.

40.     Once fraudulently inserting himself as an Illico director, General Antonio Andrade, again using his official title and power, unlawfully assumed control over the Illico bank account.  General Antonio Andrade then illicitly transferred money from Illico bank accounts

(including but not limited to accounts held in Banco de Fomento Angola) by instructing and authorizing payments be made to his privately owned companies, among them Vitagest Lda.

41.     Under color of his official position within the Angolan government, General Antonio Andrade then intimidated the AFGC staff with threats of violence and demanded that they recognize him as the owner and manager of the AFGC Assets. General Antonio Andrade also demanded that the local AFGC staff cut off all contact with AFGC senior management going forward.

42.     Beginning on or around June 2017, General Antonio Andrade scheduled a meeting with the local AFGC staff and an external consultant in which he threatened those who did not recognize his false claims to authority and ownership over the AFGC Assets. The consultant subsequently abandoned both her office and apartment located within the AFGC Assets.

43.     Throughout June and July 2017, General Antonio Andrade made repeated visits to the AFGC Assets.  In each visit, he used the power of his official position, force and threats to let the local AFGC staff know that they must either follow his instructions or suffer the consequences.

44.     During this time, using forged documents, General Antonio Andrade also stole money from AFGC by fraudulently withdrawing money from the Illico accounts for his personal use.

45.     Throughout June and July 2017, using fraud and physical force to insert himself into local AFGC management and falsely representing himself as the owner of the AFGC Assets, General Antonio Andrade attempted to sell off individual apartments that are part of the AFGC

Assets to unsuspecting third-party buyers in Angola in an effort to take the sale proceeds for his own benefit.

46.     On or around July 26, 2017, AFGC briefly managed to reappoint Ildfonso Massango as director and *Gerente* of Illico, positions that had been fraudulently assumed by General Antonio Andrade.  Once Mr. Massango was reinstalled, AFGC was then able to correct the bank signature authority for Illico.

47.     Shortly after July 26, 2017, on learning of his removal as director, General Antonio Andrade, on information and belief, then engaged an accomplice to convert (steal) the corporate seals for all of AFGC's Angolan subsidiaries.

48.     General Antonio Andrade then conspired with and engaged another Angolan military official, his son Army Captain Miguel Andrade, to perpetrate fraud through falsely stating that Miguel Andrade was a lawful representative of AFGC and had the power to unilaterally change the directors of the Angolan subsidiaries.

49.     By using their official titles and positions within the Angolan government, the Angolan Government Illegal Agents succeeded, with the conspiratorial support of the GUE, in again appointing General Antonio Andrade as director and *Gerente* of AFGC's Angolan subsidiaries (AGPV, Illico and Maximilio), on or about August 18, 2017.

50.     On or about August 18, 2017, General Antonio Andrade also conspired with the GUE to amend the bylaws of AFGC's Angolan subsidiaries to name himself as the sole legal representative and signatory of all official documents to be issued by AFGC's Angolan subsidiaries going forward.  In so doing, General Andrade unlawfully and effectively assumed full and complete control over AFGC's Angolan subsidiaries with the active support of the Angolan Instrumentalities.

**IV.    AFGC takes legal action against the Angolan Government Illegal Agents to protect the AFGC Assets**

51.    On or about August 10, 2017, in response to the official threats of physical violence and intimidation by the Angolan Government Illegal Agents, AFGC representatives arrived in Luanda to meet with the local Angolan police force.  The purpose of this visit by the AFGC representatives was to regain access to, and possession of, the AFGC Assets and to seek to secure the corporate books and records for AFGC's Angolan subsidiaries that were located at the site of the AFGC Assets.

52.    During this visit, the AFGC team arrived at the site of the AFGC Assets with the legal director of AFGC's Angolan subsidiaries (a respected Angolan lawyer), two police officers, a group of lawyers from the Portuguese-based law firm PLMJ and a private security team (G4S).

53.    The AFGC team had with them and presented certified copies of all legal documents proving 100 percent land ownership of the AFGC Assets and full and lawful director and shareholder control over all of AFGC's Angolan subsidiaries.

54.    The AFGC representatives demanded that those Angolan Government Illegal Agents who were then present at the site of the AFGC Assets, which included Angolan State Prosecutor Natasha Andrade and General Antonio Andrade's heavily-armed security detail (General Andrade himself was outside Angola at the time), immediately vacate the AFGC Assets.

55.    Angolan State Prosecutor Natasha Andrade and General Antonio Andrade's heavily-armed security detail refused to vacate the site of the AFGC Assets.

56.    Accordingly, rather than risk a physical confrontation and use of violence by the Angolan Government Illegal Agents, the AFGC representatives were forced to withdraw from their own properties.

57.     On or about August 11, 2017, the same AFGC team again returned to the premises of the AFGC Assets and again requested that the Angolan police assist in the removal of Angolan State Prosecutor Natasha Andrade and General Antonio Andrade's heavily-armed security detail from the site.

58.     Despite having a legal obligation to enable the AFGC representatives to retake control and possession of the AFGC Assets, the Angolan police refused (at the express direction of Angolan State Prosecutor Natasha Andrade) to take any action against the Angolan Government Illegal Agents or their heavily-armed security detail, thereby aiding and supporting the ongoing conspiracy by the Angolan Government Illegal Agents to deprive AFGC of lawful ownership and possession of the AFGC Assets.

59.     The Angolan police supported the Angolan Government Illegal Agents and took such actions despite the fact that they had received, in advance, all of the legal documentation by AFGC representatives clearly demonstrating that AFGC had the sole legal right to ownership, possession, and control over the AFGC Assets.

60.     Accordingly, through their failure to act, the Angolan police enabled the Angolan Government Illegal Agents and their heavily-armed security detail to remain in physical possession and control of the AFGC Assets.

61.     The Angolan Government Illegal Agents' heavily-armed security detail continues to date to patrol the buildings that make up the AFGC Assets with exposed AK 47 assault rifles.

**V.     State Prosecutor Natasha Andrade uses her official title to engage in an abuse of power to harm AFGC and convert the AFGC Assets by intimidating and conspiring with Angolan government officials**

62.     On or about August 10, 2017, following AFGC's attempt to retake physical possession and control of the AFGC Assets, in furtherance of the unlawful conspiracy, Angolan

State Prosecutor Natasha Andrade made a patently frivolous, false, baseless, and abusive criminal claim against various AFGC representatives, which falsely alleged that they had invaded private property owned by the Angolan Government Illegal Agents.

63.     On or about August 10, 2017, in furtherance of the unlawful conspiracy, Angolan State Prosecutor Natasha Andrade abused her public position and threatened one of the AFGC representatives who had attempted to regain possession of the AFGC Assets by stating that she would have him killed.

64.     Taking Angolan State Prosecutor Natasha Andrade's threat with the seriousness in which it was delivered, the AFGC representative rushed to the airport in Luanda and boarded the next available flight out of Angola.

65.     Another of the Angolan Government Illegal Agents, Captain Miguel Andrade, in furtherance of the unlawful conspiracy, then sent the AFGC representative a message shortly after he had departed, threatening that the AFGC representative had only just made it out of Angola before he would have been arrested and detained by Angolan government officials at immigration control and placed in an Angolan prison.

66.     On or about August 11, 2017, again in furtherance of the conspiracy by the Angolan Government Illegal Agents and Angolan government officials to wrongfully and illegally maintain unlawful control and possession of the AFGC Assets, Angolan State Prosecutor Natasha Andrade abused her public position by formally and falsely informing the Angolan National Director of Migration and Foreign Services that the AFGC representative who was forced to flee Angola had committed crimes and that an "international capture order" should be placed against him.

**VI.     As part of the Angolan Government Illegal Agents' pattern of intimidation and abuse of power, Captain Miguel Andrade sends a slanderous letter to the SEC replete with knowingly false accusations against AFGC in an effort to impact AFGC's public listing of securities**

67.     To further aid and abet and conspire to convert the AFGC Assets from AFGC, on August 23, 2017, Captain Miguel Andrade sent a false and defamatory complaint against AFGC to the Chairman of the SEC.  This defamatory letter was full of willful, malicious and intentionally made misrepresentations of fact and knowingly made false and fraudulent statements.

68.     In response to the defamatory complaint letter, AFGC filed an SEC Form 8-K that explained the current status of events in Angola as they related to the AFGC Assets and noted that any and all material risks to shareholders previously were stated in AFGC's DEF 14C merger disclosure. *See* **Exhibit A**, SEC Form 8-K.

**VII.    The Angolan Government Illegal Agents fraudulently inform tenants at the AFGC Assets that they are the rightful owners and that tenants should ignore their leases and pay rental income to private companies owned by the Angolan Government Illegal Agents**

69.     During the month of August 2017, the Angolan Government Illegal Agents approached individual tenants residing or working at the site of the AFGC Assets and falsely claimed to be the lawful owners and managers of the AFGC Assets.

70.     The Angolan Government Illegal Agents illegally and wrongfully demanded, under color of Angolan law, that the tenants cease all communications with AFGC and AFGC's subsidiary, Illico, renege on their current lease obligations, and direct all future rental payments to a corporate account established by the Angolan Government Illegal Agents.

71.     On or about August 23, 2017, AFGC sent correspondence to the tenants at the AFGC Assets informing them that the Angolan Government Illegal Agents who were pretending

to be the owners and managers of the AFGC Assets have committed fraud by asking tenants to make rental payments into accounts other than the lawful and proper accounts of the actual owners of the AFGC Assets.

72.     AFGC provided the tenants with documentation of lawful ownership of the AFGC Assets by AFGC and reminded the tenants of their legal obligation to continue to make rental payments pursuant to their lease agreements.

73.     On or about August 30, 2017, the Angolan Government Illegal Agents, under color of Angolan law and using their official power and titles to further their unlawful scheme, wrongfully and illegally sent their own letter to all of the tenants on site at the AFGC Assets informing them they were the lawful owners and managers of the AFGC Assets and that all future rental payments should be made to a company aligned with the Angolan Government Illegal Agents by the name of "Ausral."

74.     In response to the August 30 letter by the Angolan Government Illegal Agents, AFGC prepared another letter to the tenants at the AFGC assets informing them that:

   a.  the company Ausral does not have legal title nor valid claim to any part of the AFGC Assets, nor provided any evidence of such title or made any claim;

   b.  Ausral transferred legal title for the surface rights to the AFGC Assets to AFGC's subsidiary, Illico, back in January 2015;

   c.  AFGC alone has legal title and valid claim to the AFGC Assets in their entirety; and

   d.  AFGC, through its subsidiaries and local directors, were available to answer and clarify any questions the tenants may have and to provide any

additional documentation to the tenants to demonstrate lawful ownership and management by AFGC over the AFGC Assets.

75.     The Angolan Government Illegal Agents continue to falsely inform and use intimidation tactics, including appearing at the entrances to tenants' apartments with heavily armed guards threatening eviction, in order to unlawfully direct and seize rental payments owed by the tenants of the AFGC Assets to AFGC.

**VIII.    AFGC takes legal actions in Angola to attempt to protect its legal rights and title to, and ownership of, the AFGC Assets**

76.     On or about August 11, 2017, an AFGC representative met with an Angolan criminal prosecutor in Luanda who, after reviewing the lawful corporate and land registry title documents, advised AFGC to open a criminal case in Luanda against the Angolan Government Illegal Agents.

77.     Accordingly, on or about August 15, 2017, AFGC filed a criminal claim against the Angolan Government Illegal Agents based on their illegal, illicit, and unlawful attempt to gain control over AFGC's subsidiary, Illico, and to convert the AFGC Assets.  This criminal claim was given "Case number 3847/17IG."

78.     This criminal claim was then registered with the local police station in Luanda.

79.     In response to AFGC's registering of the criminal claim against the Angolan Government Illegal Agents with the police, AFGC's representative was informed by the police that the police needed a local Angolan prosecutor to make a decision on the criminal claim as it relates to corporate control of Illico and lawful ownership of the AFGC Assets before the police can act.

80.     On or about August 15, 2017, AFGC filed a formal request with Angolan Attorney General Joao Maria de Sousa to take action against the Angolan Government Illegal

Agents for their criminal conduct and to request police assistance to safeguard the ownership of the buildings and protection of AFGC's commercial operations.

81.     Since filing the criminal claim and submitting a formal request with Attorney General de Sousa, on information and belief, State Prosecutor Natasha Andrade conspired with Attorney General de Sousa and used the power of her official office and intimidation to prevent legitimate law enforcement action from being taken in support of AFGC and to restore lawful possession of, and title to, the AFGC Assets to AFGC.

82.     Since filing a criminal claim against the Angolan Government Illegal Agents and seeking assistance from Attorney General de Sousa, AFGC also has contacted and enlisted the support of the US Embassy in Luanda, Angola, to protect AFGC's rights to the AFGC Assets.

83.     On behalf of AFGC, the US Embassy in Luanda sent copies of the criminal claim made by AFGC to the Procuradoria-Geral da Republica de Angola ("PGR") seeking prosecutorial action against the Angolan Government Illegal Agents. In response, a meeting was arranged between an AFGC representative and the Director of the Cabinet of the PGR.

84.     At this meeting, held on or around August 24, 2017, the PGR Director informed the AFGC representative that State Prosecutor Natasha Andrade improperly and illegally was using her influence within the government and the police to prevent any action from being taken against the Angolan Government Illegal Agents and in favor of the rights of AFGC and its assets.  AFGC's representative was asked to return the following day for an update.

85.     On or around August 25, 2017, the AFGC representative returned to the PGR and met with Zacarias Selalo, Assistant to the Director of the PGR Cabinet.  Again, the PGR official representative was provided with an explanation of the unlawful conduct to date by the Angolan Government Illegal Agents and shown all of the supporting documentation attesting to AFGC

having lawful control over its wholly-owned subsidiary Illico and full legal title and ownership over the AFGC Assets.

86.     In response, at this second meeting at the PGR, the PGR representative informed the AFGC representative that AFGC had correctly followed all legal procedures in Angola and that AFGC should await a response from the PGR.

87.     To date, after unreasonable delay and despite repeated follow-up by AFGC, PGR has taken no action against the Angolan Government Illegal Agents and no action in support of AFGC's legal commercial and property rights in Angola.

88.     On information and belief, the Angolan Government Illegal Agents continue to use their official titles, positions and influence within the Angolan political and legal system to maintain and advance their unlawful actions and to prevent due process and any legal remedy in favor of AFGC.

89.     In response to the unlawful conduct and pattern of intimidation and force by the Angolan Government Illegal Agents to convert title to, and outright take, the AFGC Assets, AFGC entered into and executed a mortgage over part of the AFGC Assets, which AFGC then registered with the Angolan Land Registry. The registration of this mortgage was confirmed by the Angolan Land Registry on or about August 31, 2017.

90.     AFGC took a mortgage over part of the AFGC Assets for the sole and express purpose of trying to prevent the Angolan Government Illegal Agents from illegally transferring title and selling all or part of the AFGC Assets.  Given the high cost in obtaining a mortgage for the AFGC Assets, AFGC was only able to enter into a mortgage for approximately one-tenth of the actual property value of the AFGC Assets.

91.     Again, for the sole and express purpose of trying to prevent the Angolan Government Illegal Agents from illegally transferring title and selling all or part of the AFGC Assets, on or about August 24, 2017, AFGC executed a Promissory Agreement and entered into a Promissory Note, both of which were published in an Angolan national newspaper, relating to the AFGC Assets. The Promissory Note was effective as of September 4, 2017.

92.     On or about September 12, 2017, legal representatives of AFGC presented a formal request for an Injunction in the first section of the civil and administrative court of the Provincial Court of Luanda, case no. 2911/17, against the Angolan Government Illegal Agents, for the purpose of regaining possession of the AFGC Assets.

93.     On or about September 14, 2017, AFGC filed a new Criminal Complaint against the Angolan Government Illegal Agents for the crime of land invasion, fraud and damage. A number has not yet been assigned.

94.     On or about September 15, 2017, AFGC received an updated legal opinion from Angolan counsel that explains how AFGC has full legal title and ownership over the AFGC Assets.

95.     On or about September 20, 2017, AFGC's legal representative met with the President of the Provincial Court of Luanda to request expedient action regarding the Injunction filed by AFGC on September 12, 2017.

96.     No action to date has been taken on either the Injunction or the Criminal Complaint.  On information and belief, the Angolan Government Illegal Agents are using their official positions and political connections, abusing their power to prevent action on the Injunction and the Criminal Complaint.

**IX.    The Angolan Government Illegal Agents continue to conspire and use their official positions, force and intimidation to convert the AFGC Assets and rental income belonging to AFGC**

97.    On or about September 20, 2017, Angolan State Prosecutor Natasha Andrade facilitated the fraudulent transfer of the surface rights to the AFGC Assets into her own name by personally appearing at the Angolan Property Registry and ordering that the change be made by and through a transfer of title from Illico to Prosecutor Natasha Andrade.

98.    The fraudulent documents detail that Angolan State Prosecutor Natasha Andrade purportedly purchased the AFGC Assets, and with it all future rental income—valued at an estimated total of US$55,000,000—for a mere US$55,000.

99.    Despite the supporting documentation being forged and fraudulent, this property transfer was signed and approved by Angolan General Carniero, in his official capacity as the Governor of the Province of Luanda, thus acting under color of law and in furtherance of the unlawful conspiracy.

100.    Further, on or about September 25, 2017, when AFGC learned of the fraudulent transfer of title to the AFGC Assets, AFGC representatives appeared at the Angolan Property Registry to attempt to determine how the fraudulent transfer of title had occurred and to correct it immediately.

101.    In response to the appearance by the AFGC representatives, the official at the Angolan Property Registry acknowledged that the documents submitted by State Prosecutor Natasha Andrade to register title to the AFGC Assets were not in compliance with Angolan law and regulations and that the registrar was forced by State Prosecutor Natasha Andrade to make the change in title, with the signed land transfer order of Angolan General Carniero, regardless of its fraudulent nature.

102.    On or about September 28, 2017, AFGC's legal representative in Angola was approached by an individual claiming to represent the Angolan Government Illegal Agents who indicated that the AFGC legal representative should cease to represent AFGC immediately and threatened that the Angolan Government Illegal Agents "would see this through to the end with him" and "that he better start wearing a bullet proof vest."

103.    On or about September 22, 2017, after the fraudulent transfer of title to the AFGC Assets had been made, the Angolan Government Illegal Agents again sent a letter to one or more tenants residing on site at the AFGC Assets and requested the tenants make rental payments directly to a new bank account at Banco SOL that was opened on behalf of Illico using fraudulent documentation, thereby perpetuating the theft and conversion of rents from the commercial properties owned by AFGC.

104.    Only on or about September 22, 2017, when AFGC inquired as to how the Angolan Government Illegal Agents were able to open a new bank account on behalf of Illico, AFGC then learned that General Antonio Andrade again managed to use fraudulent documentation to reappoint himself as the sole director and *Gerente* of AFGC's Angolan subsidiaries, including Illico.

105.    When AFGC's legal representative requested to see the documentation supporting the GUE's registration of General Andrade's appointment as sole director and *Gerente* of Illico, the GUE acted in a discriminatory manner against AFGC, defied its own standard practices and refused AFGC's request without cause or reason, even though AFGC was the legal owner of Illico and its bank accounts.

**X.  The Angolan Government Illegal Agents use official government positions and force to physically threaten those who challenge their fraudulent ownership and management of the AGFC Assets**

106.    In September 2017, in furtherance of the unlawful conspiracy, General Antonio Andrade and Captain Miguel Andrade appeared unexpectedly at the Luanda offices of Illico's external accountant, Pricewaterhouse Coopers ("PwC"), and claimed to be the new lawful managers of the AFGC Assets.  The General and Captain instructed Paula Boica and Paulo Fernando Ribiero, the local PWC partner and director in charge of Illico's account, to send all the corporate records for Illico to the Angolan Government Illegal Agents' personal accountant.

107.    In response, Ms. Boica and Mr. Ribiero of PwC informed the Angolan Government Illegal Agents that that there were only two authorized people at Illico with which PwC could interact on behalf of Illico, and neither was one of the Angolan Government Illegal Agents.

108.    General Andrade and Captain Andrade threatened the safety of the local PwC staff for refusing to take direction from them.

109.    As a result of the threats issued by General Andrade and Captain Andrade, who were acting under color of law, the PwC partner, Mr. Ribiero, informed AFGC management that PwC would be terminating the local accounting contract with Illico on the basis that PWC did not feel that their staff were safe if they were to continue performing under the contract.

110.    PwC stated that the "risk was simple as these are local powerful guys with access to armed people" on top of "turning up at the office without an arranged meeting."

111.    On or about October 20, 2017, despite clear direction from AFGC to PwC not to deliver original accounting documentation that belonged to AFGC to the site of the AFGC Assets while the AFGC Assets were under the unlawful possession and control of the Angolan

Government Illegal Agents, PwC did exactly that and delivered AFGC's accounting documentation directly to Captain Miguel Andrade.

112.     On or about October 25, 2017, when AFGC representatives requested that PwC recover the original accounting documentation that should have been delivered to AFGC, PwC's senior representative said he could not do so because "we are on the ground here [in Angola] and cannot compromise the safety and well-being of our staff."

## XI.     The Angolan Ministry of Justice again discriminates against AFGC by refusing to cancel the unlawful change in directorship and management to the Angolan Government Illegal Agents

113.     In response to the GUE (a division of the Angolan Ministry of Justice) improperly registering the appointment of General Antonio Andrade as sole director and *Gerente* of AFGC's Angolan subsidiaries, on or about August 18, 2017 (as alleged above), AFGC appealed the decision by the GUE under its own procedures and demanded the reinstatement of Ildfonso Massango as the lawful director and *Gerente* of these subsidiaries.

114.     On or about November 2, 2017, the GUE formally rejected AFGC's request to cancel its unlawful registration of General Antonio Andrade as director and *Gerente* and return the rightful director and *Gerente* of AFGC's Angolan subsidiaries to his proper positions.

115.     In rejecting AFGC's request, the GUE, acting on behalf of the Angolan Ministry of Justice, also has discriminated against AFGC by forcing AFGC now to undergo a more lengthy and formal implementation process to enable the change in directorship and management – a process that was never applied to the Angolan Government Illegal Agents as they conspired with the GUE to register General Antonio Andrade as sole director and *Gerente* of AFGC's Angolan subsidiaries.

XII.   **Having been granted "license" to convert the AFGC Assets, the Angolan Government Illegal Agents continue to harass and intimidate AFGC's tenants and redirect AFGC's rental income into bank accounts controlled by the Angolan Government Illegal Agents**

116.   Having been granted license and official imprimatur by Angolan governmental authorities over the unlawful seizure of the AFGC Assets, the Angolan Government Illegal Agents are continuing in their pattern of harassment and intimidation of AFGC's tenants.

117.   Specifically, the Angolan Government Illegal Agents have been threatening to cut the water and electrical power supply to those apartments in which the tenants refuse to renege on their lease obligations to AFGC and redirect their rental payments to bank accounts controlled by the Angolan Government Illegal Agents.

118.   For example, on or about November 7 and 8, 2017, AFGC received an email exchange with at least one tenant who had the water supply to his apartment cut off and only restored after he agreed to enter into a new rental contact with a company established for and on behalf of the Angolan Government Illegal Agents and to have future rental payments directed to the corporate bank account controlled by the Angolan Government Illegal Agents.

119.   Other tenants of the AFGC Assets who have chosen not to submit to the pattern of harassment and intimidation by the Angolan Government Illegal Agents have informed AFGC that they are vacating their properties and will cease all rental payments once they have done so.

120.   Angola, at all times relevant, has aided and abetted in the unlawful conspiracy by enabling the Angolan Government Illegal Agents to convert AFGC's property through acts of fraud, illegally asserted control, and intimidation.  Angola has fostered an expectation of total impunity on the part of the Angolan Government Illegal Agents, who have had no reason to fear they will be brought to judgment in Angola for their bad acts.

121.    All conditions precedent to the bringing of this action either have occurred, have been performed, or otherwise have been waived.

122.    AFGC has retained the undersigned attorneys to represent it in the prosecution of this action and is obligated to pay such attorneys their reasonable fees and expenses.

## COUNT I
### Expropriation in Violation of International Law
*Alleged Against All Defendants*

123.    AFGC repeats and re-alleges paragraphs 1 through 122 above with the same force and effect as though fully set forth herein.

124.    Defendant Angola is a foreign sovereign and "foreign state" within the meaning of 28 U.S.C. § 1603(a).

125.    Defendants General Carneiro, General de Sousa, General Antonio Andrade, Captain Miguel Andrade, and Prosecutor Natasha Andrade are agencies or instrumentalities of Angola, and as such, are "foreign states" within the meaning of 28 U.S.C. § 1603(a).

126.    Defendants have engaged in commercial activity causing a direct and substantially effect on AGFC in the United States.

127.    Prior to the expropriation complained of herein, AFGC had full title to, and ownership of, the AFGC Assets that were the subject of an unlawful taking.

128.    Defendants caused, and permitted to be caused, a forced transfer of title to the AFGC Assets and the conversion of theft of the rents and proceeds of those assets, amounting to a direct expropriation in violation of international law.

129.    The Angolan Government Illegal Agents used their official title and power as agents of a sovereign nation and, acting under color of state law, effected an unlawful taking of the AFGC Assets.

130.    Moreover, Angola, General Carneiro and General de Sousa, through their actions and omissions despite the knowledge that the Angolan Government Illegal Agents were undertaking unlawful acts, permitted the Angolan Government Illegal Agents to utilize their official title and rank to effect the unlawful taking of the AFGC Assets.

131.    The taking occurred through a purported formal transfer of title to rights in property—the AFGC Assets—without the knowledge or consent of AFGC, and without any compensation or consideration whatsoever paid to AFGC. The taking also occurred through an outright seizure of the property and title to the property, wherein the Angolan Government Illegal Agents have physically occupied the premises through the placement of their armed security personnel, blocking the entrance of any of AFGC's representatives.

132.    The taking of the AFGC Assets was not for a public purpose. On the contrary, it is indisputable that the taking was for a private purpose—for the benefit and enrichment of the Angolan Government Illegal Agents.

133.    The taking of the AFGC Assets was discriminatory in nature, since Defendants have specifically targeted the AFGC Assets based on the nationality of AFGC's shareholders.

134.    The expropriation unreasonably discriminated based upon the nationality of the AFGC shareholders in violation of international law. A clear example of the unreasonable discrimination based on nationality perpetrated by Defendants is the letter of Captain Miguel Andrade to the Chairman of the SEC, which makes false and defamatory claims regarding AFGC's activities in Angola, AFGC executives and shareholders who are not Angolan nationals, and AFGC's entitlement to its own property.

135.    Expropriation of the AFGC Assets was not in accordance with due process of law. In fact, AFGC has been denied fair and due process of law in Angola in its attempts to bring the

Angolan Government Illegal Agents to justice and in its attempts to recover the AFGC Assets. Defendants have blocked AFGC's legal action against the Angolan Government Illegal Agents.

136.     Stated simply, Defendants have permitted or otherwise acquiesced to the unlawful taking of the AFGC Assets and denied and blocked AFGC's access to the Angolan judicial system to seek a declaration of its right and title to, and ownership over, the AFGC Assets.

137.     Defendants' unlawful taking of the AFGC Assets from AFGC was undertaken without prompt, adequate, and effective compensation, thus rendering the taking of the AFGC Assets illegal.

**WHEREFORE**, AFGC demands judgment for damages against all Defendants, for damages and compensation of the fair market value of the AFGC Assets, valued at over US$55 million; the value of the rents wrongfully converted and taken; the value of future profits and rental income resulting from the taking of AFGC's investment; and prejudgment interest, attorney's fees, costs, and all such other relief this Court deems just, fair, and equitable.

## COUNT II
### Violation of RICO, 18 U.S.C. § 1962(c)
### Conducting the Affairs of the Enterprise
#### *Alleged Against All Defendants (the "RICO Defendants")*

138.     AFGC repeats and re-alleges paragraphs 1 through 122 above with the same force and effect as though fully set forth herein.

139.     Each RICO Defendant meets the definition of a "person" as defined in 18 U.S.C. § 1961(3).

140.     The RICO Defendants collectively make up an enterprise by "association in fact" (the "RICO Enterprise") pursuant to 18 U.S.C. § 1961(4).

141.     The RICO Enterprise is an association in fact based on the evidence and allegations set forth herein. Specifically, the RICO Defendants have come together for several purposes, including the following:

a.   Taking possession and ownership over the AFGC Assets for private financial gain;

b.   Enriching public officials while unreasonably discriminating against foreign companies and their shareholders; and

c.   Intentionally participating in a scheme to convert and deprive AFGC of its lawfully owned property in Angola, referred herein as the AFGC Assets, and using the mails and wires in furtherance of that scheme.

142.     The RICO Defendants participated in the operation or management of the criminal enterprise by taking several actions, including the following:

a.   Angola, General de Sousa, and General Carneiro refused to take action against the Angolan Government Illegal Agents or their security team, thus furthering and aiding and abetting Defendants' conspiracy to deprive AFGC of the lawful ownership of the AFGC Assets;

b.   Angola, General de Sousa, and General Carneiro refused to take action against the Angolan Government Illegal Agents despite their knowledge and possession of legal documentation that clearly and unequivocally demonstrated that AFGC, through its subsidiaries, had the sole legal right and title to, and interest in, the AFGC Assets, thus furthering and aiding and abetting Defendants' conspiracy to deprive AFGC of the lawful ownership of the AFGC Assets;

c.  The Angolan Government Illegal Agents caused the forgery of corporate documents purporting to appoint General Antonio Andrade as a director and manager of AFGC's subsidiaries, thus giving him access to bank accounts, thus furthering and aiding and abetting Defendants' conspiracy to deprive AFGC of the lawful ownership of the AFGC Assets;

d.  The Angolan Government Illegal Agents used their official power and title to allow General Antonio Andrade to obtain access to, and assume control over, the bank accounts of AFGC's subsidiaries, thus providing him access to AFGC's funds and diverting monies to his private bank accounts, thus furthering and aiding and abetting Defendants' conspiracy to deprive AFGC of the lawful ownership of the AFGC Assets;

e.  The Angolan Government Illegal Agents used their official power and title to intimidate and threaten AFGC staff and tenants of the AFGC Assets for the purpose of divesting AFGC of its property for their own personal gain, thus furthering and aiding and abetting Defendants' conspiracy to deprive AFGC of the lawful ownership of the AFGC Assets;

f.  The Angolan Government Illegal Agents used their official power and title to coerce tenants within the AFGC Assets to make rental payments directly to them, instead of to AFGC, the rightful and lawful owner of the AFGC Assets, thus furthering and aiding and abetting Defendants' conspiracy to deprive AFGC of the lawful ownership of the AFGC Assets;

g.  The Angolan Government Illegal Agents used their official power and title to prevent action on the Injunction and Criminal Complaint filed on behalf

of AFGC, and have otherwise manipulated the political and legal system to their advantage with total impunity, thus furthering and aiding and abetting Defendants' conspiracy to deprive AFGC of the lawful ownership of the AFGC Assets;

h. The Angolan Government Illegal Agents used their official power and title to force other governmental agencies in Angola to recognize the right (though false and fraudulent documentation and representations) of General Antonio Andrade to the AFGC Assets and bank accounts described herein, thus furthering and aiding and abetting Defendants' conspiracy to deprive AFGC of the lawful ownership of the AFGC Assets; and

i. The Angolan Government Illegal Agents have used their official power and title to force the legal transfer of title to the surface rights to the AFGC Assets into the name of Angolan State Prosecutor Natasha Andrade, thus furthering and aiding and abetting Defendants' conspiracy to deprive AFGC of the lawful ownership of the AFGC Assets.

143.  The RICO Defendants engaged in a pattern of racketeering activity by doing the following:

a. The RICO Defendants engaged in a scheme to divest AFGC of its assets in Angola for their own personal gain when causing the forced transfer of title to the AFGC Assets, and when exerting control over AFGC's bank accounts and other property;

b. The RICO Defendants specifically intended to deny and divest AFGC of its property through a forced transfer and by submitting fraudulent documentation;

c. The RICO Defendants used the mail and wires in furtherance of this scheme, as provided in further detail below;

d. Such actions deprived AFGC of its assets and property interest in monies, all of which were directly and indirectly taken by the RICO Defendants through their fraudulent scheme; and

e. The RICO Defendants continue to deprive AFGC of its assets and present and future income through their unlawful acts.

144.    The RICO Defendants and the RICO Enterprise are separate and distinct. Each RICO Defendant is free to act independently of the others and to advance its own interest, but each is also part of the conspiracy.

145.    Pursuant to and in furtherance of the fraudulent scheme, the RICO Defendants committed multiple related acts of mail and wire fraud. Such acts of mail and wire fraud constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

146.    Moreover, the RICO Defendants engaged in a pattern of racketeering activity by committing multiple predicate acts within a ten-year period, which predicate acts are in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud). The RICO Defendants' specific actions to this effect include the following:

a. On August 11, 2017, State Prosecutor Natasha Andrade used the mail or wire to transmit a letter to the Angolan National Director of Migration and Foreign Services, falsely accusing an AFGC representative of crimes in

Angola, in an apparent attempt to have him imprisoned or expelled from the country to further the conspiracy to divest AFGC of its rightfully owned property.

b. On August 23, 2017, Captain Miguel Andrade used the mail or wire to transmit a complaint letter to the Chairman of the SEC, which letter contained false and defamatory statements aimed at discrediting and undermining AFGC and its shareholders with respect to its investment in Angola – the AFGC Assets;

c. During August, September, and October of 2017, General Antonio Andrade used the mail or wire to access the Illico (AFGC's subsidiary) bank accounts to transfer funds belonging to AFGC to privately owned companies controlled by the Angolan Government Illegal Agents;

d. During August, September, and October of 2017, the Angolan Government Illegal Agents used the mail or wire to transmit forged corporate documentation to take ownership over AFGC's subsidiary companies, and ultimately to take ownership over the AFGC Assets;

e. During August, September, and October of 2017, Captain Miguel Andrade used the wire to make threatening and intimidating statements to AFGC representatives in an attempt to deter AFGC representatives from entering into Angola and attempting to retake possession of the AFGC Assets; and

f. During August, September, and October of 2017, the Angolan Government Illegal Agents used the mail or wire to transmit letters to the tenants at the AFGC Assets, falsely and fraudulently notifying the tenants

that the Angolan Agents, through their private companies, were the lawful

owners of the AFGC Assets, and that payment of rents should be made for

the benefit of the Angolan Government Illegal Agents.

147.    The RICO Defendants' predicate acts are related.  The RICO Defendants share

similar purposes and goals to the detriment of similar victims—U.S. corporate and individual

citizens.  The methods of commission of the predicate acts are also related, involving use of the

mail and wires to commit fraud and forgery, and to publish false and defamatory information

regarding AFGC and its representatives with the intent to damage AFGC and discredit its right to

its lawfully owned assets, including the future right to own and derive income from the assets.

148.    The RICO Defendants' amount to a threat of continued criminal activity.  These

predicate acts continue to have adverse consequences on AFGC, in that it no longer has access to

the AFGC Assets or the income derived from it. The RICO Defendants continue to reap the

bounty of their racketeering activities undertaken at the expense of AFGC.

149.    The RICO Defendants' activities have affected interstate or foreign commerce.

150.    Moreover, these activities have caused a domestic injury to AFGC's business, as a

US corporation with US shareholders.

151.    The illegal conduct described above is of a continuous nature and presents the

threat of future legal conduct.

152.    As a direct and proximate result of the RICO Defendants' racketeering activities

and violations of 18 U.S.C. § 1962(c), AFGC has suffered a complete and total loss of its

property in Angola as a result of the RICO Defendants' actions. Such losses are in excess of

US$55 million, which without question has severely impacted AFGC and its shareholders.

**WHEREFORE**, AFGC demands judgment for damages against all Defendants, for damages and compensation of the fair market value of the AFGC Assets, valued at over US$55 million; the value of the rents wrongfully converted and taken; the value of future profits and rental income resulting from the taking of AFGC's investment; treble damages for violations of RICO; and prejudgment interest, attorney's fees, costs, and all such other relief this Court deems just, fair, and equitable.

### COUNT III
**Violation of RICO, 18 U.S.C. § 1962(d)**
**Conspiracy to Conduct the Affairs of the Enterprise**
*Alleged Against All Defendants*

153.    AFGC repeats and re-alleges paragraphs 1 through 122 above and paragraphs 139 through 152 with the same force and effect as though fully set forth herein.

154.    As set forth above, the RICO Defendants did agree and conspire to conduct and participate in the above RICO enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c) and (d). Specifically, the RICO Defendants conspired to take possession and ownership over the AFGC Assets for private financial gain; enrich Angolan public officials while unreasonably discriminating against foreign companies and their shareholders; and intentionally participating in a scheme to deprive AFGC of its lawfully owned property in Angola and using the mails and wires in furtherance of that scheme.

155.    Within ten calendar years, all RICO Defendants did cooperate jointly and severally in the commission of two or more predicate acts itemized at 18 U.S.C. §§ 1961(a) and (b).

156.    The RICO Defendants committed two or more of said offenses in such a manner that they calculated and premeditated intentionally to threaten continuity. In other words, Defendants posed a continuing threat of their respective racketeering activities.

157.    Each RICO Defendant agreed to the overall objective of the conspiracy and willfully became a member of the conspiracy. Or, in the alternative, at least one defendant agreed with at least one other defendant to commit two predicate acts as part of the conspiracy.

158.    As a direct and proximate result of the RICO Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), AFGC has been injured in its business in property in that it has suffered a complete and total loss of the AFGC Assets, its investment in Angola, and all income derived from that investment.

**WHEREFORE**, AFGC demands judgment for damages against all Defendants, for damages and compensation of the fair market value of the AFGC Assets, valued at over US$55 million; the value of the rents wrongfully converted and taken; the value of future profits and rental income resulting from the taking of AFGC's investment; treble damages for violations of RICO; and prejudgment interest, attorney's fees, costs, and all such other relief this Court deems just, fair, and equitable.

## COUNT IV
### Conspiracy to Commit Fraud and Conversion
### *Alleged Against All Defendants*

159.    AFGC repeats and re-alleges paragraphs 1 through 122 above with the same force and effect as though fully set forth herein.

160.    Defendants formed and operated a conspiracy to take the AFGC Assets and divest AFGC of its investment purely for the financial gain of the Angolan Government Illegal Agents. Such financial gain of the Angolan Government Illegal Agents occurred as the direct result of total economic loss to AFGC.

161.    In furtherance of this conspiracy, Defendants took multiple overt acts, including, without limitation, the following:

a. Despite having no lawfully obtained title to, ownership in, or management or other corporate position in AFGC or its subsidiaries, General Antonio Andrade used his official title and powers in the Angolan government to fraudulently prepare powers of attorney and appoint an associate as the shareholder representative of Illico's corporate parents for his own benefit, and represented to the tenants of the AFGC Assets and the general public that he was the *Gerente* (General Manager) of Illico, which false representation was relied upon by the tenants and the public;

b. General Antonio Andrade used his power and title to appoint himself a director and *Gerente* of Illico to take control over the company's bank accounts, which the bank relied upon and allowed him to withdraw funds from those accounts for his personal use;

c. General Antonio Andrade conspired with Captain Miguel Andrade to perpetrate fraud by falsely stating that Captain Andrade was a lawful representative of AFGC with the power to unilaterally change the directors of AFGC's Angolan subsidiaries, which false representation was relied upon by the tenants and the public;

d. The Angolan Government Illegal Agents conspired to appoint General Antonio Andrade as a director of AFGC's Angolan subsidiaries, which false representation was relied upon by the tenants and the public;

e. Captain Miguel Andrade sent a false and defamatory complaint letter against AFGC to the Chairman of the SEC for the purpose of discrediting AFGC's claims;

f.  The Angolan Government Illegal Agents interfered with AFGC's relationship with its tenants by demanding the tenants cease communications with AFGC, falsely notifying the tenants that the Angolan Agents were the lawful owners of the AFGC Assets, requiring the tenants to make rental payments to the Angolan Agents and not AFGC;

g.  The Angolan Government Illegal Agents unlawfully seized and converted, for their own use and benefit, the rental payments from the tenants of the AFGC Assets, thus diverting the rental income from AFGC to themselves for improper financial gain;

h.  The Angolan Government Illegal Agents continue to intimidate and threaten tenants of the AFGC Assets by appearing at the tenants' apartments with armed guards;

i.  General Antonio Andrade and Captain Miguel Andrade falsely represented to Illico's external accountant that they were the lawful owners of the AFGC Assets and instructed the accountant to send all corporate records to the personal accountant for the Angolan Government Illegal Agents, and further threatened the safety of staff of Illico's accountant should they not follow such orders;

j.  Prosecutor Natasha Andrade has made a false criminal claim against several AFGC representatives, claiming they had invaded property belonging to the Angolan Government Illegal Agents;

k.  Prosecutor Natasha Andrade threatened to have one of the AFGC representatives killed should he attempt to regain possession of the AFGC Assets;

l.  Prosecutor Natasha Andrade falsely reported to Angolan government officials that an AFGC representative had committed crimes in Angola and was forced to flee;

m.  Prosecutor Natasha Andrade has used her official position and intimidation to prevent any action from being taken in support of AFGC in an attempt to restore its ownership over the AFGC Assets;

n.  The Angolan Government Illegal Agents have used their official title and power to prevent action being taken on the Injunction and Criminal Complaint lodged by AFGC; and

o.  The Angolan Government Illegal Agents have employed representatives to intimidate persons associated with AFGC, including its legal representative whose safety and life was threatened.

162.  Moreover, certain Defendants furthered this conspiracy to commit fraud through their omissions, as follows:

a.  Angolan officials and government refused to take action against the Angolan Government Illegal Agents or their heavily-armed security detail, despite the knowledge that the Angolan Government Illegal Agents were conducting illegal activities with respect to the AFGC Assets;

b.  Angolan officials and government supported, aided, and abetted the Angolan Government Illegal Agents through inaction and failure to

prosecute the Angolan Government Illegal Agents despite that AFGC provided, in advance, all legal documentation unequivocally demonstrating that AFGC had the sole legal right to ownership and possession of the AFGC Assets;

c. The Angolan government has taken no action against the Angolan Government Illegal Agents for their scheme to divest AFGC of its property for the benefit of the Angolan Agents, and likewise the government has taken no action in support of AFGC's legal and commercial property rights in Angola; and

d. Angolan officials and government refused to permit AFGC to see the documentation that allegedly demonstrated General Antonio Andrade's appointment as *Gerente* of Illico, AFGC's subsidiary company that held title to the AFGC Assets.

163.   As a direct and proximate resolute of Defendants' actions, AFGC has suffered actual damages in the form of the loss of an amount in excess of US$55 million.

**WHEREFORE**, AFGC demands judgment for damages against all Defendants, for damages and compensation of the fair market value of the AFGC Assets, valued at over US$55 million; the value of the rents wrongfully converted and taken; the value of future profits and rental income resulting from the taking of AFGC's investment; and prejudgment interest, attorney's fees, costs, and all such other relief this Court deems just, fair, and equitable.

## COUNT V
### Tortious Interference with Contract
#### *Alleged Against All Defendants*

164.     AFGC repeats and re-alleges paragraphs 1 through 122 above with the same force and effect as though fully set forth herein.

165.     As the owner of the AFGC Assets in Angola, AFGC held valid legal title to its property and possessed a valid business expectancy that it would continue to hold legal title to its property, free and clear of third-party claims or liens. Further, as the owner of the AFGC Assets, AFGC had contractual relationships with commercial and residential tenants, who provided rental payments to AFGC on a regular basis.

166.     Defendants knew, at all times material, that AFGC held valid legal title to its investment property, and that a valid business expectancy of continuing to hold legal title for the benefit of AFGC existed. Defendants also knew of the existence of a landlord-tenant relationship between AFGC and its tenants.

167.     Defendants intentionally interfered, without justification or legal cause, with AFGC's right and title to, and possession of, the AFGC Assets in Angola. Such improper actions caused a termination of AFGC's valid business expectancy.

168.     Moreover, Defendants intentionally interfered with AFGC's contractual and business relationships with the tenants of the AFGC Assets by diverting the rental payments to the Angolan Government Illegal Agents for their financial gain.

169.     As a result of the disruption of its valid business expectancy and the taking its contractual rights, AFGC has suffered severe damage.

**WHEREFORE**, AFGC demands judgment for damages against all Defendants, for damages and compensation of the fair market value of the AFGC Assets, valued at over US$40

million; the value of the rents wrongfully converted and taken; the value of future profits and rental income resulting from the taking of AFGC's investment; and prejudgment interest, attorney's fees, costs, and all such other relief this Court deems just, fair, and equitable.

### COUNT VI
### Defamation
### *Alleged Against All Defendants*

170.    AFGC repeats and re-alleges paragraphs 1 through 122 above with the same force and effect as though fully set forth herein.

171.    Through the SEC Complaint Letter transmitted to the Chairman of the SEC by Captain Miguel Andrade, AFGC was the subject of false and defamatory statements.

172.    Such false and defamatory statements were published to a third party – the SEC.

173.    Captain Miguel Andrade published the false and defamatory statements with the intent of causing damage to AFGC. As a result, publishing the false and defamatory statements was beyond negligent—it was deliberate and made with the intent of causing severe harm to AFGC and its representatives.

174.    As a result of the publishing of the SEC Complaint Letter, AFGC has suffered harm including, without limitation, the following: (a) actual harm to its reputation as a publicly-listed U.S. corporation; (b) actual harm through the decrease in value of its shares; (c) actual or legal harm in having to defend itself to the SEC against the false and defamatory statements made by Captain Miguel Andrade. AFGC will likely continue to suffer such harm, if not more.

**WHEREFORE**, AFGC demands judgment for damages against all Defendants, for damages and compensation arising out of the defamatory statements, prejudgment interest, attorney's fees, costs, and all such other relief this Court deems just, fair, and equitable.

## COUNT VII
## Conversion
### *Alleged Against All Defendants*

175.    AFGC repeats and re-alleges paragraphs 1 through 122 above with the same force and effect as though fully set forth herein.

176.    AFGC owned and had the right to possess the AFGC Assets that was taken from it by Defendants, as described above, and which property was never returned to AFGC.

177.    Defendants exercised an unlawful assertion of ownership, dominion, or control of AFGC's property through their deliberate and intentional actions, which were contrary to international law.

178.    AFGC demanded the return of its property, on a number of occasions and in a number of ways, and Defendants refused to return the property.

179.    Defendants have deprived AFGC of its investment in real property and have denied and repudiated AFGC's right to use and possess its property.

180.    Defendants' deliberate and unlawful actions caused damage to AFGC.

**WHEREFORE**, AFGC demands judgment for damages against all Defendants, for damages and compensation of the fair market value of the AFGC Assets, valued at over US$55 million; the value of the rents wrongfully converted and taken; the value of future profits and rental income resulting from the taking of AFGC's investment; and prejudgment interest, attorney's fees, costs, and all such other relief this Court deems just, fair, and equitable.

## COUNT VIII
## Unjust Enrichment
### *Alleged Against All Defendants*

181.    AFGC repeats and re-alleges paragraphs 1 through 122 above with the same force and effect as though fully set forth herein.

182.    Defendants deprived AFGC of its property in violation of international law and without consideration, compensation, or any legal right to take the AFGC Assets.

183.    Defendants were enriched and retained the benefit of their taking of the AFGC Assets from AFGC.

184.    Under these circumstances, it would be inequitable and unjust for Defendants to retain the benefits of possession and use of the AFGC Assets without providing just compensation to AFGC.

185.    AFGC has no adequate remedy at law.

**WHEREFORE**, AFGC demands judgment for damages against all Defendants, for damages and compensation of the fair market value of the AFGC Assets, valued at over US$40 million; the value of the rents wrongfully converted and taken; the value of future profits and rental income resulting from the taking of AFGC's investment; and prejudgment interest, attorney's fees, costs, and all such other relief this Court deems just, fair, and equitable.

## COUNT IX
### Accounting
#### *Alleged Against the Angolan Government Illegal Agents*

186.    AFGC repeats and re-alleges paragraphs 1 through 122 above with the same force and effect as though fully set forth herein.

187.    The Angolan Government Illegal Agents have improperly asserted dominion and control over bank accounts with funds belonging to AFGC (the Illico accounts) and have taken funds from those accounts, diverting the funds to corporate accounts belonging to and controlled by the Angolan Government Illegal Agents.

188.    The Angolan Government Illegal Agents have never accounted for, compensated, or repaid the value of the funds taken from AFGC.

189.    As a result of the Angolan Government Illegal Agents' unlawful exercise of dominion and control over these bank accounts, AFGC has been unable to use or invest those funds.

190.    As a result of the Angolan Government Illegal Agents' wrongful acts, AFGC has been damaged and demands a full accounting of the stolen funds and profits wrongfully taken by the Angolan Government Illegal Agents.

**WHEREFORE**, AFGC requests that this Court order the Angolan Government Illegal Agents to render an accounting to AFGC, and for all other relief this Court deems just, fair, and equitable.

## COUNT X
### Action to Impose a Constructive Trust
### *Alleged Against All Defendants*

191.    AFGC repeats and re-alleges paragraphs 1 through 122 above with the same force and effect as though fully set forth herein.

192.    In the alternative to, or in conjunction with, the relief requested above, AFGC seeks to establish and impose a constructive trust on all of the assets of AFGC, including the land, real estate, leasehold improvements, and bank accounts. AFGC has no adequate remedy at law.

193.    Defendants committed a wrongful act by causing and effecting a forced, formal transfer of title to the AFGC Assets and conversion of AFGC's funds, from AFGC (through its affiliate companies) and for the benefit of the Angolan Government Illegal Agents—General Antonio Andrade, Captain Miguel Andrade, and Prosecutor Natasha Andrade.

194.    The specific property at issue (the AFGC Assets) acquired by the Angolan Government Illegal Agents is directly traceable to Defendants' conduct.

195.    AFGC is legally entitled to the AFGC Assets, which were taken by Defendants through actions contrary to international law.

196.    For these reasons, the parties holding the AFGC Assets should not be allowed in good conscience to keep such property.

**WHEREFORE**, AFGC requests that this Court establish a constructive trust, and for all other relief this Court deems just, fair, and equitable.

<u>**REQUEST FOR JURY TRIAL**</u>

AFGC requests a trial by jury on all issues so triable.

Date: November 15, 2017

By: <u>*/s/ Anthony F. Cavanaugh*</u>
Anthony F. Cavanaugh
D.C. Bar No: 482760
LINOWES & BLOCHER LLP
7200 Wisconsin Avenue, Suite 800
Bethesda, MD 20814
(301) 961-5191
 acavanaugh@linowes-law.com

By: <u>*/s/ Harold E. Patricoff*</u>
Harold E. Patricoff (*Pro Hac Vice* to be filed)
Florida Bar No. 508357
hpatricoff@shutts.com
Kristin Drecktrah Paz (*Pro Hac Vice* to be filed)
Florida Bar No. 91026
kpaz@shutts.com
SHUTTS & BOWEN LLP
200 S. Biscayne Boulevard, Suite 4100
Miami, Florida 33131
Tel.: (305) 358-6300
Fax: (305) 381-9982

*Attorneys for Plaintiff, Africa Growth Corporation*